**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUIT**

| | |
|---|---|
| ANDREYA DEFREITAS, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>I.A.C., INC. d/b/a INDUSTRIAL ACCEPTANCE CORPORATION,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Andreya Defreitas ("Plaintiff"), on behalf of herself and all others similarly situated, states as follows for her class action complaint against Defendant, I.A.C., Inc. d/b/a Industrial Acceptance Corporation ("IAC" or "Defendant"):

**INTRODUCTION**

1.      On or before February 24, 2025, Defendant lost control over its computer network and the highly sensitive personally identifiable information[1] ("PII" or "Private Information") stored thereon in a data breach perpetrated by cybercriminals (the "Data Breach"). Upon information and belief, the Data Breach has impacted 79,216 [2] of Defendant's current and former clients.

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] *See Data Breach Notices*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/c2a95af1-d639-45ab-ab0d-8dbefca3f72a.html (last visited June 1, 2026).

2.      The notorious "INC"[3] and "Akira"[4] and ransomware gangs have been implicated in the Data Breach, and Akira has posted that it possesses sensitive Private Information stolen from Defendant on its dark web leak site.

3.      Upon information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train their employees on cybersecurity, failed to adequately monitor their agents, contractors, vendors, and suppliers in handling and securing the Private Information of Plaintiff, and failed to maintain reasonable security safeguards or protocols to protect the Class's Private Information—rendering it an easy target for cybercriminals.

4.      Defendant's failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their Private Information.

5.      Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of Private Information misuse.

6.      In failing to adequately protect its clients' information, and by failing to adequately notify them about the breach, Defendant violated state law and harmed thousands of its current and former clients.

7.      Plaintiff and the Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiff and members of the proposed Class trusted Defendant with their Private Information. But Defendant betrayed that trust. Defendant failed to properly use

---

[3] *See* Exhibit A, a copy of the letter Defendant sent to the Maine Office of the Attorney General about the Data Breach (the "Breach Notice").

[4] *Industrial Acceptance Corporation*, BREACHSENSE, https://www.breachsense.com/breaches/industrial-acceptance-corporation-data-breach/ (last visited June 1, 2026).

up-to-date security practices to prevent the Data Breach.

8.      Plaintiff is a former client of Defendant and a Data Breach victim.

9.      The exposure of one's Private Information to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiff and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

## PARTIES

10.     Plaintiff, Andreya Defreitas, is a natural person and citizen of Massachusetts. She resides in Revere, Massachusetts, where she intends to remain.

11.     Defendant, I.A.C., Inc. d/b/a Industrial Acceptance Corporation, is a stock corporation organized under the laws of the state of Connecticut with a principal place of business at 138 Orange St., New Haven, Connecticut, 06510.

## JURISDICTION & VENUE

12.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are over 100 putative Class Members and Plaintiff and Defendant are citizens of different states.

13.     This Court has personal jurisdiction over Defendant because Defendant maintains their principal place of business in this District and does substantial business in this District.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

*IAC*

15.     IAC states it is the "#1 lender" within the "credit challenged pool of consumers" on

the East Coast.[5] According to Defendant, it provides "non-prime" automotive lending to consumers at over 1,000 franchise and independent automotive dealers.[6]

16.    As part of its business providing subprime loans, on information and belief, IAC accumulates highly sensitive Private Information of its current and former clients.

17.    In collecting and maintaining its clients' Private Information, IAC agreed it would safeguard the data in accordance with state law and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their Private Information.

18.    IAC understood the need to protect its current and former clients' Private Information and prioritize its data security.

19.    Indeed, IAC's Privacy Notice states:

   a.    "we are committed to protecting the personal information we obtain about you.  We want you to know that we take strong precautions to make sure the information we collect is not shared with anyone who should not have it.;" and

   b.    "[w]e limit access to your information to only those Industrial Acceptance Corporation employees who have a need to know."[7]

20.    Despite recognizing its duty to do so, on information and belief, IAC has not implemented reasonably cybersecurity safeguards or policies to protect clients' Private Information or trained its IT or data security employees to prevent, detect, and stop breaches of its

---

[5] *About IAC Credit,* IAC, https://iaccredit.com/index.php?option=com_content&view=article&id=80&Itemid=482 (last visited June 1, 2026).
[6] *Id.*
[7] *Privacy Notice,* IAC, https://iaccredit.com/index.php?option=com_content&view=article&id=81:iac-privacy-statement&catid=86:page-buttom&Itemid=476 (last visited June 1, 2026).

systems. As a result, Defendant leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to clients' Private Information.

***Defendant's Data Breach***

21.    On information and belief, IAC collects and maintains unencrypted Private Information in its computer systems.

22.    According to Defendant's Breach Notice, on February 24, 2025, Defendant "became aware of unauthorized activity in its network."[8]

23.    IAC then launched an investigation, which determined that "IAC experienced a ransomware event claimed by the group, INC."[9] Defendant admits that "[o]n or around March 4, 2025, IAC learned that certain files were *taken* from its network by the unauthorized actor."[10]

24.    In other words, Defendant's cyber and data security systems were completely inadequate in that it allowed cybercriminals to obtain and steal files containing a treasure trove of thousands of its clients' highly sensitive Private Information.

25.    IAC reported to the Texas Attorney General that the Private Information stolen in the Data Breach included (at least) Plaintiff's and the Class's Social Security numbers and driver's license numbers.[11]

26.    Through its inadequate security practices, Defendant exposed Plaintiff's and the Class's Private Information for theft and sale on the dark web.

27.    Defendant acknowledged that the Data Breach created a present, continuing, and

---

[8] Ex. A.
[9] *Id*.
[10] *Id*.
[11] *Data Security Breach Reports*, ATTORNEY GENERAL OF TEXAS, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited June 1, 2026).

significant risk of suffering identity theft, warning Plaintiff and the Class to "remain vigilant against incidents of identity theft and fraud by reviewing your credit reports and account statements for suspicious activity and to detect errors."[12]

28.     IAC failed in its duties when its inadequate security practices caused the Data Breach. In other words, IAC's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the Private Information stored in its systems. And thus, IAC caused widespread injury and monetary damages.

29.     And yet, Defendant waited until May 28, 2026, over fourteen months after it learned that its clients' Private Information was stolen by a known cybercriminal group, to notify victims about the Data Breach.[13]

30.     Defendant's delayed notice kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

31.     IAC has offered complimentary credit monitoring services to Data Breach victims. However, this does not adequately address the lifelong harm that victims will face following the Data Breach. Indeed, the breach involves Private Information that cannot be changed, such as Social Security numbers.

32.     Even with several months of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiff's and Class Members' Private Information is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

33.     Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's Private

---

[12] Ex. A.

[13] *Id*.

Information. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

*Cybercriminal Groups Claim Credit for the Data Breach*

34.    Worryingly, two separate ransomware groups have claimed responsibility for the Data Breach.

35.    The group identified by Defendant in its Breach Notice as having stolen Private Information in the Data Breach is the infamous cybercriminal group "INC."

36.    INC first surfaced in July 2023.[14] It operates as a ransomware-as-a-service platform, where a "core" group performs functions such as developing the ransomware malware and encryption tools and running INC's dark web "leak site." INC "affiliates" handle the breaches themselves and negotiate with affected companies.[15] Thus, under such a model, many anonymous individuals on the dark web have access to stolen data after a data breach.

37.    INC hacks into organization's computer networks using techniques such as spear phishing and exploiting known vulnerabilities in software.[16] Once inside, INC's malware both steals data and locks down computer systems until a ransom is paid to unlock them.[17]

38.    To make matters worse, the ransomware group known as "Akira" has also taken credit for the Data Breach.

39.    Akira is a notorious cybercriminal group that was the subject of a United States

---

[14] Paul Bischoff, *Auto lender IAC warns 79,000+ people of data breach that leaked SSNs*, COMPARITECH (May 29, 2026), https://www.comparitech.com/news/auto-lender-iac-warns-79000-people-of-data-breach-that-leaked-ssns/.

[15] *INC Ransom: The Ransomware Group That Abandoned All Ethical Boundaries*, BREACHED.COMPANY (Nov. 23, 2025), https://breached.company/inc-ransom-the-ransomware-group-that-abandoned-all-ethical-boundaries/.

[16] *See Auto lender IAC warns 79,000+ people of data breach that leaked SSNs*, n. 14, *supra*.

[17] *Id*.

Cybersecurity and Infrastructure Security Agency ("CISA") Advisory.[18]

40.    In its Advisory, CISA warned organizations that Akira is known to obtain "initial access to organizations through a virtual private network (VPN) service without multifactor authentication (MFA) configured, mostly using known Cisco vulnerabilities."[19]

41.    Once it breaks into an organization's network, Akira exfiltrates (*i.e.*, steals) data then encrypts it utilizing a sophisticated hybrid encryption scheme.[20] Akira threat actors use a double-extortion model, demanding a ransom payment to unlock data, and, to further apply pressure, threatening to leak the stolen data on its dark web portal if a ransom payment is not made.[21]

42.    Akira is active on the dark web, maintaining two sites – one displaying information about the group and advertising stolen records from data breach victims, and the other for negotiations.[22]

43.    On or about March 12, 2025, Akira published a post on one of its dark web websites naming IAC.[23]

```
2025-03-12 │ Indastrial Acceptanc │ IAC offers consumer financing to both the Retail and Direct Sales │
           │ e Corporation        │ market.                                                          │
           │                      │                                                                  │
           │                      │ We are ready to upload more than 60 GB of essential corporate doc │
           │                      │ uments such as: financial data (audits, payment details, reports) │
           │                      │ , health condition certificates, inside correspondences, etc.     │
           │                      │                                                                  │
```

44.    Akira's post named Defendant, and stated "IAC offers consumer financing to both

---

[18] *#StopRansomware: Akira Ransomware*, CISA (Apr. 18, 2024), https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-109a.

[19] *Id*.

[20] *Id*.

[21] *See id*.

[22] Jaime Andres and Bello Vieda, *A spotlight on Akira ransomware from X-Force Incident Response and Threat Intelligence*, SECURITY INTELLIGENCE (May 2, 2024), https://securityintelligence.com/x-force/spotlight-akira-ransomware-x-force/.

[23] *See Auto lender IAC warns 79,000+ people of data breach that leaked SSNs,* n. 14, *supra*.

the Retail and Direct Sales market. We are ready to upload more than 60 GB of essential corporate documents such as: financial data, (audits, payment details, reports, health condition certificates, inside correspondences, etc."[24]

45.    Akira's post indicates it stole 60 gigabytes of data – including a vast quantity of Plaintiff's and Class Members' sensitive Private Information, including their Social Security numbers.

46.    Because the post was created in March 12, 2025, over a year after Akira stated it "ready to upload" the Private Information stolen in the Data Breach, on information and belief, Plaintiff's and the Class's Private Information has already been published on the dark web.

47.    On information and belief, IAC has not made any public statements regarding INC, Akira, or whether it made a ransom payment.

48.    However, even if Defendant made a ransom payment, there is no guarantee that the Private Information stolen in the Data Breach will be deleted.[25] The stolen Private Information is valuable, and can easily be sold to another threat actor, so there is little incentive to delete it.[26]

49.    Thus, on information and belief, Plaintiff's and the Class's stolen Private Information has already been published by INC, Akira, or by other cybercriminals on the dark web.

50.    Despite its duties to safeguard Private Information, Defendant did not in fact follow industry standard practices in securing clients' Private Information, as evidenced by the Data Breach.

---

[24] *Id*.
[25] Steve Adler, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, THE HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/.
[26] *Id*.

***The Data Breach was a Foreseeable Risk of Which Defendant was on Notice.***

51.     It is well known that Private Information, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

52.     Indeed, in 2024, a 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[27]

53.     Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[28]

54.     Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep Private Information private and secure, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

55.     Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks, including ransomware attacks involving data theft, because warnings were readily available and accessible via the internet.

56.     In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in

---

[27] *2024 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter. org/publication/2024-data-breach-report/ (last visited March 24, 2025).

[28] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited July 22, 2025).

their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[29]

57.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[30]

58.    This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

59.    Thus, Defendant knew or should have known that they should have encrypted their clients' Social Security numbers and other sensitive data elements to protect against their publication and misuse in the event of a cyberattack.

***Plaintiff's Experience and Injuries***

60.    Plaintiff is a former client of IAC, having had an active loan with IAC from on or about 2021 to April 2026.

61.    As a condition of receiving an auto loan with IAC, Plaintiff provided Defendant

---

[29] Catalin Cimpanu, *Ransomware mentioned in 1,000+ SEC filings over the past year*, ZDNET (Apr. 30, 2020),  https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.
[30] *Ransomware Guide*, U.S. CISA, https://www.cisa.gov/stopransomware/ransomware-guide  (last visited July 22, 2025).

with her Private Information, including but not limited to her name, contact information, Social Security number, address, date of birth, driver's license information, and debit card and bank account numbers to make loan payments. Defendant used that Private Information to facilitate servicing a loan to Plaintiff, and required Plaintiff to provide that Private Information to obtain auto financing.

62.     Plaintiff provided her Private Information to Defendant and trusted that the company would use reasonable measures to protect it according to state and federal law.

63.     On information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by INC, Akira or by other cybercriminals on the dark web.

64.     Plaintiff has not received direct notice from Defendant about the Data Breach.[31]

65.     Defendant deprived Plaintiff of the earliest opportunity to guard herself against the Data Breach's effects by failing to notify her, and only attempting to notify her over a year after the Data Breach occurred.

66.     As a result of its inadequate cybersecurity, Defendant exposed Plaintiff's Private Information for theft by cybercriminals and sale and/or publication on the dark web.

67.     In the aftermath of the Data Breach, in 2025, Plaintiff's Private Information was used to open a utility account in Texas in her name. Plaintiff never authorized such an account and has no connection to the state of Texas. Plaintiff's credit accounts were negatively impacted by the "hard pull" made to her credit accounts.

68.     On information and belief, Plaintiff's non-public Private Information, such as her Social Security number, was needed to perpetuate the fraud described above.

---

[31] Ex. A.

69.     Moreover, in the aftermath of the Data Breach, Plaintiff began experiencing a significant increase in spam, scam, and phishing calls and texts, suggesting that her Private Information is now in the hands of cybercriminals. The spam, scam, and phishing communications Plaintiff is receiving are a distraction, must be blocked, and waste Plaintiff's time each day. Plaintiff reasonably believes that the unwanted communications are related to the Data Breach as they have being received on the same phone number she provided to Defendant.

70.     Plaintiff suffered actual injury from the exposure of her Private Information — which violates her rights to privacy.

71.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property— property that Defendant were required to adequately protect.

72.     As a result of the Data Breach, Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing her online account passwords, and monitoring her credit information.

73.     Plaintiff has already spent and will continue to spend considerable time and effort monitoring her accounts to protect herself from identity theft. Plaintiff fears for her personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

74.     Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. Plaintiff is especially concerned about the exposure and theft of her Social Security number, and what impact this will have. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

75. Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff about the Data Breach.

76. Once an individual's Private Information is for sale and access on the dark web, as Plaintiff's Private Information is here as a result of the Data Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[32] On information and belief, the scam, spam and phishing calls and texts Plaintiff is experiencing are a result of the Data Breach.

77. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

78. Plaintiff and members of the proposed Class have suffered injury from the misuse of their Private Information that can be directly traced to Defendant.

79. As a result of Defendant's failure to prevent the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and the class have suffered or are at an increased risk of suffering:

    a. The loss of the opportunity to control how their Private Information is used;

    b. The diminution in value of their Private Information;

    c. The compromise and continuing publication of their Private Information;

    d. Out-of-pocket costs associated with the prevention, detection, recovery, and

---

[32] Ryan Toohil, *What do Hackers do with Stolen Information*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

remediation from identity theft or fraud;

e.  Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f.  Delay in receipt of tax refund monies;

g.  Unauthorized use of stolen Private Information; and

h.  The continued risk to their Private Information, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the Private Information in its possession.

80.    Stolen Private Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen Private Information can be worth up to $1,000.00 depending on the type of information obtained.

81.    The value of Plaintiff's and the proposed Class's Private Information on the black market is considerable. Stolen Private Information trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

82.    Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

15

83. It can take victims years to spot identity or Private Information theft, giving criminals plenty of time to use that information for cash.

84. One such example of criminals using Private Information for profit is the development of "Fullz" packages.

85. Cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

86. The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and the Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and members of the Class's stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

87. Defendant disclosed the Private Information of Plaintiff and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the Private Information of Plaintiff and the Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized

16

financial accounts (i.e., identity fraud), all using the stolen Private Information.

88.    Defendant's failure to properly notify Plaintiff and the Class of the Data Breach exacerbated Plaintiff's and the Class's injuries by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

***Consumers Prioritize Data Security***

89.    In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[33] Therein, Cisco reported the following:

a.    "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[34]

b.    "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[35]

c.    89% of consumers stated that "I care about data privacy."[36]

d.    83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[37]

---

[33] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).
[34] *Id*. at 3.
[35] *Id*.
[36] *Id*. at 9.
[37] *Id*.

e.     51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[38]

f.     75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[39]

90.    Defendant knew or should have known that adequate implementation of cybersecurity and protection of Private Information, including Plaintiff and the Class's Private Information, was important to its clients.

***Defendant failed to adhere to FTC guidelines.***

91.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of Private Information.

92.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.  The guidelines explain that businesses should:

a.    protect the personal customer information that they keep;

b.    properly dispose of personal information that is no longer needed;

c.    encrypt information stored on computer networks;

d.    understand their network's vulnerabilities; and

e.    implement policies to correct security problems.

93.    The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

---

[38] *Id*.

[39] *Id*. at 11.

94. The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

95. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

96. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to clients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

*Defendant Failed to Follow Industry Standards*

97. Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

98. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers;

monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

99.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

100.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

101.    Plaintiff sues on behalf of herself and the proposed nationwide class ("Class, defined as follows, pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3):

> All individuals residing in the United States whose Private Information was compromised in the Data Breach, including all those who received notice of the breach.

102.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant have a controlling interest, any of Defendant's officers or directors, any successors, and any Judge who adjudicates this case, including their staff and immediate family.

103.    Plaintiff reserves the right to amend the class definition.

104.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23.

a.   **Numerosity**. Plaintiff is representative of the Class, consisting of 79,216 members, far too many to join in a single action;

b.   **Ascertainability**. Members of the Class are readily identifiable from information in Defendant's possession, custody, and control;

c.   **Typicality**. Plaintiff's claims are typical of class claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

d.   **Adequacy**. Plaintiff will fairly and adequately protect the proposed Class's interests. Her interests do not conflict with the Class's interests, and she has retained counsel experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf, including as lead counsel.

e.   **Commonality**. Plaintiff's and the Class's claims raise predominantly common fact and legal questions that a class wide proceeding can answer for the Class. Indeed, it will be necessary to answer the following questions:

i.   Whether Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's Private Information;

ii.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

iii. Whether Defendant were negligent in maintaining, protecting, and securing Private Information;

iv.      Whether Defendant breached contract promises to safeguard Plaintiff's and the Class's Private Information;

v.      Whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

vi.      Whether Defendant's Data Breach Notice was reasonable;

vii.      Whether the Data Breach caused Plaintiff's and the Class's injuries;

viii.      What the proper damages measure is; and

ix.      Whether Plaintiff and the Class are entitled to damages, treble damages, or injunctive relief.

105.    Further, common questions of law and fact predominate over any individualized questions, and a class action is superior to individual litigation or any other available method to fairly and efficiently adjudicate the controversy. The damages available to individual plaintiffs are insufficient to make individual lawsuits economically feasible.

**FIRST CLAIM FOR RELIEF**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

106.    Plaintiff incorporates all previous paragraphs as if fully set forth herein.

107.    Plaintiff and the Class entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their Private Information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

108.    Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their Private Information in a data breach. And here, that foreseeable danger came to pass.

22

109. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if their Private Information was wrongfully disclosed.

110. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff and Class Members' Private Information.

111. Defendant owed—to Plaintiff and Class Members—at least the following duties to:

    a. exercise reasonable care in handling and using the Private Information in its care and custody;

    b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

    c. promptly detect attempts at unauthorized access;

    d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their Private Information.

112. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

113. Defendant also had a duty to exercise appropriate clearinghouse practices to remove

23

Private Information it was no longer required to retain under applicable regulations.

114.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

115.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information, a necessary part of obtaining services from Defendant.

116.    The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendant hold vast amounts of Private Information, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the Private Information —whether by malware or otherwise.

117.    Private Information is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

118.    Defendant improperly and inadequately safeguarded the Private Information of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

119.    Defendant breached these duties as evidenced by the Data Breach.

120.    Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' Private Information by:

      a.    disclosing and providing access to this information to third parties and

24

b.      failing to properly supervise both the way the Private Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

121.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

122.    Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

123.    Defendant have admitted that the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

124.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

125.    And, on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

126.    Defendant's breach of their common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Private Information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and

remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CLAIM FOR RELIEF
### Negligence *Per Se*
### (On Behalf of Plaintiff and the Class)

127.    Plaintiff incorporates all previous paragraphs as if fully set forth herein.

128.    Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

129.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the Private Information entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive Private Information.

130.    Defendant breached its respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Private Information.

131.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

132.    The harm that has occurred is the type of harm the FTC Act is intended to guard

26

against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

133. But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

134. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their Private Information.

135. Defendant's various violations and its failure to comply with applicable laws and regulations constitute negligence *per se*.

136. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CLAIM FOR RELIEF**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

137. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

138. Defendant offered to provide financial services to Plaintiff and members of the Class if, as a condition of receiving those services, Plaintiff and members of the Class provided Defendant with their Private Information.

139. In turn, Defendant agreed it would not disclose the Private Information it collected to unauthorized persons. Defendant also promised to safeguard its clients' Private Information.

140. Plaintiff and the members of the Class accepted Defendant's offers by providing Private Information to Defendant in exchange for receiving financial services from Defendant.

141.    Implicit in the parties' agreements was that Defendant would provide Plaintiff and members of the Class with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

142.    Plaintiff and the members of the Class would not have entrusted their Private Information to Defendant in the absence of such an agreement with Defendant.

143.    Defendant materially breached the contracts they had entered with Plaintiff and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. Defendant also breached the implied contracts with Plaintiff and members of the Class by:

    a.    Failing to properly safeguard and protect Plaintiff's and members of the Class's Private Information;

    b.    Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

    c.    Failing to ensure the confidentiality and integrity of electronic Private Information that Defendant created, received, maintained, and transmitted.

144.    The damages sustained by Plaintiff and members of the Class as described above were the direct and proximate result of Defendant's material breaches of their agreement(s).

145.    Plaintiff and members of the Class have performed under the relevant agreements, or such performance was waived by the conduct of Defendant.

146.    The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to

their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

147. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

148. Defendant failed to advise Plaintiff and members of the Class of the Data Breach promptly and sufficiently.

149. In these and other ways, Defendant violated their duty of good faith and fair dealing.

150. Plaintiff and members of the Class have sustained damages because of Defendant's breaches of their agreements, including breaches of it through violations of the covenant of good faith and fair dealing.

151. Plaintiff, on behalf of herself and the Class, seeks compensatory damages for breach of implied contract, which includes the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of the Plaintiff and the Class)**

152. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

153. This claim is plead in the alternative to the breach of implied contractual duty claim.

154. Plaintiff and members of the Class conferred a benefit upon Defendant in the form of interest on their loan payments. Defendant also benefited from the receipt of Plaintiff's and the Class's Private Information, as this was used to facilitate their provision of financial services.

155. Defendant appreciated or had knowledge of the benefits conferred upon itself by

Plaintiff and members of the Class.

156.    Under principals of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and the proposed Class's services and their Private Information because Defendant failed to adequately protect their Private Information. Plaintiff and the proposed Class would not have done business with Defendant, or provided their Private Information to Defendant, had they known Defendant would not adequately protect their Private Information.

157.    Defendant should be compelled to disgorge into a common fund to benefit Plaintiff and members of the Class all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged here.

**FIFTH CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**(On Behalf of the Plaintiff and the Class)**

158.    Plaintiff incorporates all previous paragraphs as if fully set forth herein.

159.    Given the relationship between Defendant and Plaintiff and Class members, where Defendant became guardian of Plaintiff's and Class members' Private Information, Defendant became a fiduciary by their undertaking and guardianship of the Private Information, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff's and Class members' Private Information; (2) to timely notify Plaintiff and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

160.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Defendant's relationship with them—especially to secure their Private Information.

161.    Because of the highly sensitive nature of the Private Information, Plaintiff and Class

members would not have entrusted Defendant, or anyone in Defendant's position, to retain their Private Information had they known the reality of Defendant's inadequate data security practices.

162. Defendant breached its fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' Private Information.

163. Defendant also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

164. As a direct and proximate result of Defendant's breach of their fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**SIXTH CLAIM FOR RELIEF**
**Declaratory Judgment Act**
**28 U.S.C. §§ 2201, *Et Seq.***
**(On Behalf of Plaintiff and the Class)**

165. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

166. This is a claim declaratory relief for Plaintiff and the Class.

167. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

168. Defendant owed a duty of care to Plaintiff and Class Members, which required Defendant to adequately monitor and safeguard Plaintiff's and Class Members' Private Information.

169. Defendant still possesses the Private Information belonging to Plaintiff and Class Members.

31

170. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

171. As a result of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security.

172. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

   a. Defendant owes a legal duty to secure Plaintiff's and Class Members' Private Information under the common law, the FTC Act, and other state and federal laws and regulations, as set forth herein;

   b. Defendant's existing data monitoring measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect individuals' Private Information; and

   c. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiff's and Class Members' Private Information.

173. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security protocols consistent with legal and industry standards to protect the data entrusted to it.

174. If an injunction is not issued, Plaintiff and the Classes will suffer irreparable injury and lack an adequate legal remedy to prevent another data breach of Defendant's computer

systems. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

175.    Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff's and Class Members' injuries.

176.    The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. The cost of Defendant's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendant have a pre-existing legal duty to employ such measures.

177.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach of Defendant's systems and network, thus preventing future injury to Plaintiff and to other Class Members whose Private Information would be further compromised.

178.    Following the issuance of the declaratory relief requested herein, pursuant to 28 U.S.C. § 2202, Plaintiff and Class Members will seek any further necessary or proper relief, including damages, after reasonable notice and hearing, against Defendant.

**PRAYER FOR RELIEF**

Plaintiff and members of the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B. Awarding declaratory and other equitable relief as is necessary to protect the

interests of Plaintiff and the Class;

C. Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

D. Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the stolen Private Information;

E. Awarding Plaintiff and the Class damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G. Awarding attorneys' fees and costs, as allowed by law;

H. Awarding prejudgment and post-judgment interest, as provided by law;

I. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J. Granting such other or further relief as may be appropriate under the circumstances.

## JURY DEMAND

Plaintiff hereby demands that this matter be tried before a jury.

Dated: June 2, 2026                         Respectfully Submitted,

*/s/ Oren Faircloth*
Oren Faircloth (Bar No. ct30530)
**SIRI & GLIMSTAD LLP**
100 Pearl Street
14th Floor - #16946876
Hartford, CT 06103
Tel: (929) 677-5181
ofaircloth@sirillp.com

34

Raina Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
Tel: (872) 263-1100
Fax: (872) 263-1109
sam@straussborrelli.com

* *Pro hac vice forthcoming*

*Attorneys for Plaintiff and Proposed Class*

35